UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


PETCO ANIMAL SUPPLIES                    CIV. NO. 10-682 (SRN/JSM)
STORES, INC., INTERNATIONAL
PET SUPPLIES and DISTRIBUTION, INC.      REPORT AND RECOMMENDATION

          Plaintiffs,

v.

INSURANCE COMPANY OF NORTH AMERICA,
a PENNSYLVANIA CORPORATION,

          Defendant.

This matter is before the Court on the parties' cross motions for summary judgment [Docket Nos. 58, 63].  David Taylor, Esq. and Jeffrey M. Baill, Esq. appeared on behalf of plaintiffs PETCO Animal Supplies Stores, Inc. and International Pet Supplies and Distribution, Inc.  Cindy L. Butler, Inc. appeared on behalf of defendant Insurance Company of North America.

This matter was referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1 by the Honorable Susan Richard Nelson, United States District Judge.

## I.   BACKGROUND

Medtronic sued PETCO Animal Supplies Stores, Inc. and International Pet Supplies and Distribution, Inc.[1] (collectively "PETCO") after an aquarium heater Medtronic purchased from PETCO overheated and allegedly caused a fire at one of

---

[1]   IPSD is a wholly owned subsidiary of PETCO.  Amended Complaint ("DJ Amended Complaint"), ¶14 [Docket No. 14].

Medtronic's facilities.   See Medtronic v. PETCO Amended Complaint ("Medtronic Amended Complaint"), ¶¶8, 9, Civ. No. 09-363 (DWF/JSM) (the "Medtronic Action") [Docket No. 59].   The heater was an aquarium heater designed and manufactured by Meiko Pet Corporation of Taiwan ("Meiko").   DJ Amended Complaint, ¶15; Affidavit of Cindy L. Butler in Support of Insurance Company of North America's ("ICNA") Motion for Summary Judgment ("Butler Aff."), Ex. L (Expert Statement of Opinions by Beth Anderson, P.E.), pp. 2, 4 [Docket No. 66-2].   Medtronic claimed damages in excess of $1,800,000.   Rule 26(f) Report, p. 2 [Medtronic Action, Docket No. 8].

PETCO contends it is covered under a vendors broad form endorsement in an insurance policy that ICNA issued to Meiko ("ICNA/Meiko policy").   DJ Amended Complaint, ¶¶16, 37.   PETCO began this declaratory judgment action ("DJ Action") after ICNA refused PETCO's tender of defense and claim for coverage under the ICNA/Meiko policy.   Id., ¶¶23, 51, 52.   The DJ Amended Complaint alleged that the ICNA/Meiko policy had a $2,000,000 liability limit and that Medtronic was seeking approximately $1,800,000 for its losses.   Id., ¶¶12, 14.   ICNA answered the Amended Complaint, denying that PETCO was covered under the ICNA/Meiko policy.   Answer to DJ Amended Complaint, ¶8 [DJ Action, Docket No. 22].

On October 27, 2010, this Court conducted a settlement conference for both the Medtronic Action and the DJ Action.   [Medtronic Action, Docket No. 65; DJ Action, Docket No. 24].   In attendance were attorneys and client representatives for Medtronic and PETCO, insurer Chartis (insurer to PETCO), and counsel and the client representative for ICNA.   During the settlement conference, Medtronic and PETCO agreed to enter into a Miller-Shugart Agreement and Assignment.   Affidavit of David A.

2

Taylor in Support of PETCO's Motion for Summary Judgment ("Taylor Aff."), Ex. 4

(Miller-Shugart Agreement) [Docket No. 61-4].   Pursuant to the Miller-Shugart

Agreement, PETCO and Medtronic agreed as follows:

> (1)    As a direct and proximate cause of a malfunction in the aquarium heater, Medtronic suffered property damage and business interruption losses in the total amount of $2,031,705.92—an amount that included prejudgment interest and taxable costs.  Taylor Aff., Ex. 4, p. 1.

> (2)    ICNA's policy provided liability coverage to indemnify PETCO and IPSD from negligence claims in the amount of $2,000,000 annual aggregate limit and $2,000,000 occurrence limit.  Id., pp. 1, 2.

> (3)    There was a strong likelihood that a reasonable and impartial jury would find that Medtronic suffered damages in the amount of $1,746,000, consisting of $1,296,000 in total inventory write-off and $450,000 in "total Non-OP Expense (personnel costs and outside vendor services).  Id., pp. 2, 3.

> (4)    Defendants incurred attorneys' fees and expenses in defense of the Medtronic action and in pursuing insurance coverage in the DJ action in the amount of $286,762.78.  Id., p. 3.

> (5)    Medtronic would be entitled to prejudgment interest from the date of the fire (May 20, 2007) plus taxable costs, totaling $184,166.19.  Id.

> (6)    At the settlement conference on October 27, 2010, PETCO made a settlement demand to ICNA and put ICNA on notice that it intended to enter into a Miller-Shugart Agreement if ICNA continued to deny coverage.  ICNA continued to deny coverage and did not make any reasonable offers to settle Medtronic's claims.  PETCO put ICNA on notice of the possibility of a Miller-Shugart Agreement on July 9, 2010 and continued to warn ICNA about such an agreement up through the date of the settlement conference on October 27, 2010.  Id., pp. 4-5, 7.

> (7)    PETCO stipulated to judgment against it in the amount of $1,050,000, plus prejudgment interest and taxable costs.  The amount "[was] based on a careful assessment of

the nature and extent of Plaintiff's damages, analysis of liability risks, uncertainty regarding a decision on a pending motion from the Federal Magistrate regarding the admissibility of Defendants' sole expert's testimony, and Defendants' self-insured retention before their excess carrier would provide coverage, and of what a reasonable and impartial jury would likely and reasonably return." Id., p. 5, ¶2.  Medtronic agreed to seek recovery for this judgment only from ICNA or any other insurer of Meiko, and not PETCO. Id., p. 5, ¶¶ 1, 2; p. 5, ¶6.

(8)     PETCO agreed to assign its claims against ICNA for coverage and defense costs to Medtronic.  Id., p. 6, ¶4.

(9)     PETCO agreed to pay Medtronic $63,237.22 as additional damages, and their insurer Chartis, agreed to pay $286,762.78,[2] for a total of $350,000.  In the event that Medtronic recovered any amounts from ICNA or others, Medtronic agreed to pay back to PETCO up to the amount of $350,000 based on how much was recovered by Medtronic from these other sources.  Id., pp. 8-9, ¶¶13, 14.

PETCO and Medtronic also entered into a Miller-Shugart Assignment, in which PETCO assigned its claims against ICNA and Meiko to Medtronic.  Taylor Aff., Ex. 4 (Miller Shugart Assignment).   The Assignment required PETCO to cooperate with Medtronic in its prosecution of claims against ICNA, including meeting with Medtronic's lawyers to discuss facts underlying the claims and to provide testimony, if required.  Id., ¶3.

The Medtronic Action was dismissed with prejudice on December 17, 2010, based on the parties' stipulation.  [Medtronic Action, Docket Nos. 66, 67 and 68].

PETCO has now moved for summary judgment in the DJ Action, contending that it is covered under the ICNA/Meiko policy and that the Miller-Shugart Agreement

---

[2]     Paragraph 13 referred to $236,762.78, but based on Paragraph 14, the Court believes that may be an error and the parties meant to state $286,762.78.

between it and Medtronic is enforceable.  PETCO's Memorandum of Law In Support of Motion for Summary Judgment ("PETCO Mem."), p.1 [Docket No. 60].

ICNA brought a cross-motion for summary judgment arguing that as a matter of law there is no coverage for the damage caused by the aquarium heater because the ICNA/Meiko policy unambiguously provided coverage only for products that met safety standards, such as the standards established by the Underwriters' Laboratories ("UL"),[3] and it is undisputed that the aquarium heater was neither UL-approved nor did it meet any other safety standards.  ICNA Memorandum of Law In Support of Motion for Summary Judgment ("ICNA Mem."), pp. 9-13 [Docket No. 65].  Further, ICNA submitted that the PETCO/Medtronic Miller-Shugart Agreement is void and unenforceable pursuant to Minnesota law governing the enforceability of such agreements.  Id., pp. 13-21.

## II.     STANDARD OF REVIEW

### A.     Summary Judgment

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986);  see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "'Only disputes over facts that might affect the outcome of

---

[3]     The "UL" mark on a product "means that UL has tested and evaluated representative samples of that product and determined that they meet UL requirements."  http://www.ul/global/eng/pages/corporate/aboutul/ulmarks.  If a product carries the UL mark, "it means UL found that representative product samples met UL's safety requirements.  These requirements are primarily based on UL's own published standards for safety."  Id.

the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F.Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248). "[I]f the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted." Id. (quoting Anderson, 477 U.S. at 248).

The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted).

When considering a motion for summary judgment, the Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the non-moving party. Enterprise Bank v. Magna Bank of Mo., 92 F.3d 743,747 (8th Cir. 1996); Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).

B.    **Miller-Shugart Settlements**

This Court must first decide whether the ICNA/Meiko policy provides coverage for Medtronic's losses.  If there is no coverage, questions regarding the enforceability of the Medtronic/PETCO Miller-Shugart Agreement are moot.  To provide a context for the parties' Miller-Shugart Agreement, the Court will briefly review the purpose and enforceability of these agreements.[4]

When an insurance carrier denies coverage for a liability claim brought by its insured, the insured and plaintiff may agree to entry of judgment against the insured on the condition that the judgment is collectible only from the insurer.  Miller v. Shugart, 316 N.W.2d 729, 734 (Minn. 1982); see also Peterson v. Wilson Twp., 672 N.W.2d 556, 557, n.1 (Minn. 2003) (same).

In general, a Miller-Shugart settlement is enforceable against the insurer if:

> 1)    The insurer has denied all obligations to pay damages on behalf of the insured;
>
> 2)    The insurer (if it is not deemed to have waived notice) has received notice of the settlement and an "opportunity" to participate;
>
> 3)    The insured is left without coverage by any other insurer to pay the claimed damages;
>
> 4)    The settlement amount is later deemed to be reasonable;
>
> 5)    The insured could have liability to the claimant;
>
> 6)    The settlement was not the product of fraud or collusion; and

---

[4]    This Court's Order dated June 10, 2011, more completely examined the history of Miller-Shugart agreements and issues regarding the validity and enforceability of such arrangements.  Order, pp. 9-15 [DJ action, Docket No. 43].

> 7)   Coverage is ultimately determined to exist for the claim that became a judgment.

Theodore J. Smetak, <u>Minnesota Commercial General Liability Insurance Policy: Annotated</u>, at 23 (2008); <u>Steen v. Those Underwriters at Lloyds, London</u>, 442 N.W.2d 158, 164 (Minn. Ct. App. 1989) (if settling defendant breaches the duty of cooperation clause of its policy, <u>Miller-Shugart</u> agreement may be void); <u>Buysse v. Baumann-Furrie & Co.</u>, 481 N.W.2d 27, 29 (Minn. 1992) (an "authentic" <u>Miller-Shugart</u> agreement requires that the insurer has denied all coverage).

"Collusion, for purposes of a <u>Miller-Shugart</u> settlement, is a lack of opposition between a plaintiff and an insured that otherwise would assure that the settlement is the result of hard bargaining." <u>Independent Sch. Dist. 197 v. Accident & Cas. Ins.</u>, 525 N.W.2d 600, 607 (Minn. Ct. App. 1995). "In most cases, the only potential collusion is between the insured and the plaintiff, and the collusion inquiry is therefore satisfied by determining if the settlement is reasonable." <u>Koehnen v. Herald Fire Ins. Co.</u>, 89 F.3d 525, 529 (8th Cir. 1996) (citation omitted). But a settlement that shifts financial liability from one insurer to another insurer is collusive as a matter of law when the insurer from whom the settlement funds are collectible was deprived of an opportunity to participate in the settlement process." <u>Id.</u> at 530; <u>Burbach</u>, 560 N.W.2d at 110 ("[it was never the intent of <u>Miller-Shugart</u> to shift the risk of defense and coverage from one insurer to another.")

ICNA alleged that the PETCO/Medtronic <u>Miller-Shugart</u> Agreement is invalid for a variety of reasons, including that PETCO had other insurance available to it (the National Union/Chartis policy) and therefore, had not been "abandoned" by its own insurer; the <u>Miller-Shugart</u> Agreement attempted to shift the risk from one insurer

8

(National Union/Chartis) to ICNA; and PETCO hired Medtronic's counsel to pursue the declaratory judgment action, which ICNA contended was an indicia of collusion. ICNA Mem., pp. 15-20. PETCO disagreed, submitting that the Miller-Shugart Agreement should be enforced because it was reasonable and was not the product of fraud or collusion. PETCO Mem., pp. 9-16.

### C.   Interpreting Insurance Policies

Minnesota law governs the interpretation of insurance issues in a diversity case. W3i Mobile, LLC v. Westchester Fire Ins. Co., 632 F.3d 432, 434 (8th Cir. 2011) (citing Babinski v. American Family Ins. Group, 569 F.3d 349, 351 (8th Cir. 2009)). Under Minnesota law, the interpretation and construction of an insurance policy is a matter of law for the court. Watson v. United Servs. Auto Ass'n, 566 N.W.2d 683, 688 (Minn. 1997); Caledonia Cmty. Hosp. v. St. Paul Fire & Marine Ins. Co., 239 N.W.2d 768, 770 (Minn. 1976).

"[G]eneral principles of contract interpretation apply to insurance policies." Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 45 (Minn. 2008) (quoting Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246, 249 (Minn. 1998)). Therefore, the Court must interpret unambiguous policy language "according to plain, ordinary sense so as to effectuate the intentions of the parties." Id. (quoting Canadian Universal Ins. Co. v. Fire Watch, Inc., 258 N.W.2d 570, 572 (Minn.1977)) (internal quotation marks omitted); Nathe Bros., Inc. v. American Nat'l Fire Ins. Co., 615 N.W.2d 341, 344 (Minn. 2000) ("insurance policies are interpreted to give effect to intent of the parties); see also Hammer v. Investors Life Ins. Co. of N. Am., 511 N.W.2d 6, 8 (Minn. 1994) ("the court is bound to attribute the usual and accepted meaning to [a] phrase [and] . . . is not free to

construe the phrase in such a way as to afford coverage."); Gorr v. Consolidated Foods Corp., 91 N.W.2d 772, 782 (Minn. 1958) (the court cannot set aside clear and unambiguous provisions of an insurance policy to favor an insured).

"Language in a policy is ambiguous if it is susceptible to two or more reasonable interpretations." Id. Ambiguity in an insurance contract is construed in favor of the insured and against the insurer because "most insurance policies are presented as pre-printed forms, which a potential insured must usually accept or reject as a whole. Nathe Bros., 615 N.W.2d at 344 (citing Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co., 366 N.W.2d 271, 277 (Minn. 1977)). However, the court "may not ... read an ambiguity into the plain language of an insurance contract." Hubred v. Control Data Corp., 442 N.W.2d 308, 310 (Minn. 1989); In re SRC Holding Corp., 545 F.3d 661, 666 (8th Cir. 2008) (applying Minnesota law) ("[the Court's] duty is to 'fastidiously guard against the invitation to create ambiguities where none exist.") (citation and quotation omitted).

When interpreting an insurance contract, the court must consider the policy as a whole, giving effect to all of its provisions. In re SRC Holding Corp., 545 F.3d at 666; General Cas. Co. of Wis. v. Wozniak Travel, Inc., 762 N.W.2d 572, 575 (Minn. 2009); Haarstad v. Graff, 517 N.W.2d 582, 584 (Minn. 1994). All terms of an insurance policy must be given effect if possible. Bobich v. Oja, 104 N.W.2d 19, 24 (Minn. 1960); Steele v. Great W. Cas. Co., 540 N.W.2d 886, 888 (Minn. Ct. App.1995), review denied (Feb. 9, 1996).

In ascertaining the intent of the parties, the Minnesota Supreme Court cautioned:

> The intent of the contracting parties is to be ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a

meaning in accordance with the obvious purpose of the insurance contract as a whole.

Cement, Sand & Gravel Co. v. Agricultural Ins. Co. of Watertown, New York, 30 N.W.2d 341, 345 (Minn. 1947); see also Land O' Lakes, Inc. v. Employers Mut. Liab. Ins. Co. of Wis., Civ. No. 09-693 (PJS/JSM), 2010 WL 5095658 at *2 (D. Minn. Nov. 24, 2010) (quoting Cement, Sand & Gravel Co.).

"While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006). Exclusions "are construed narrowly and strictly against the insurer, and like coverage, in accordance with the expectation of the insured." Id. (citation omitted). "[O]nce the insurer shows the application of an exclusion clause, the burden of proof shifts back to the insured because the exception to the exclusion 'restores' coverage for which the insured bears the burden of proof." SCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305, 314 (Minn. 1995), rev'd on other grounds Bahr v. Boise Cascade Corp., 766 N.W.2d 910 (Minn. 2009).

On the other hand, "[a] condition precedent . . . is one which is to be performed before the agreement of the parties becomes operative. A condition precedent calls for the performance of some act or the happening of some event after the contract is entered into, and upon the performance or happening of which its obligation is made to depend." National Union Fire Ins. V. Schwing Amer., Inc., 446 N.W.2d 410, 412 (Minn. Ct. App. 1989) (quotation and citation omitted). "In harmony with general principles of proof, the burden of proof is on the injured party to establish all facts essential to the existence of liability to him or her of the insurer. The claimant, therefore, has the burden

of proving that all conditions precedent specified in the policy have been satisfied."  7A Couch on Insurance, §107.41.

With these standards in mind, the Court turns to the ICNA/Meiko policy to determine if there is coverage for Medtronic's losses.

## III.   ANALYSIS

### A.   The ICNA/Meiko Policy

The Declarations page of the ICNA/Meiko policy states at Item 6 that the policy provides coverage for a number of different products including aquarium heaters that are "UL/CSA[5] approved and/or complied with the mandatory and/or voluntary safety standards of importing countries."  Butler Aff., Ex. G (ICNA Products Liability Insurance Policy issued to Meiko) [Docket No. 66-1, p. 67].   Item 10 of the Declarations page describes the various provisions of the Endorsement attached to the policy, including several exclusions (asbestos, mold and fungi, pollution, professional liability, punitive damages, pure financial loss, silica, terrorism and USA/Canada domiciled operations), along with other provisions entitled Additional Insured, Efficacy Clause, Millennium Endorsement, Minimum Earned Premium Clause, Products Warranty.  Id., pp. 67-68. The section of the Endorsement entitled "Products Warranty" stated:

> It is warranted, and a <u>condition precedent to recovery</u> hereunder, that Air Pumps, Heater, Health Stone, Heated Mat, Heated Bowl and Heated Bucket are UL/CSA [Canadian Standards Association] approved and/or complied with the mandatory and/or voluntary safety standards of importing countries.  <u>Failure to comply with the condition of this warranty shall render this policy null and void.</u>

Id., p. 80 (emphasis added).

---

[5]   "UL/CSA" stands for Underwriters Laboratories/Canadian Standards Association.

When ICNA originally denied coverage, it relied on this provision and called it the "Products Warranty exclusion."  Taylor Aff., Ex. 3 (letter from INA Taipei representative to PETCO's counsel dated January 14, 2010) ("Of critical importance, the INA policy contains a warranty provision on its Declaration page as well as a Products Warranty exclusion. * * * It also appears from the information available that any claim by PETCO would not be covered by virtue of the INA Taipei Policy's Products Warranty limitation. INA Taipei has been advised that the aquarium heater was not subject to UL/CSA standards.  Assuming this to be correct, the heater did not and could not conform to UL/CSA standards and would not be covered under the INA Taipei policy.").[6]   It is undisputed that the aquarium heater sold by PETCO to Medtronic was not UL-approved.  ICNA Mem., p. 11; PETCO Mem., p. 14.

## B.   The "Products Warranty" Provision

PETCO argued that the safety standard requirement described in the "Products Warranty" section of the Endorsement is an exclusion and as such, it is ICNA's burden to show that the exclusion applies.  PETCO's Reply Memorandum in Support of Motion for Summary Judgment ("PETCO Reply"), pp. 2-5 [Docket No. 77].   According to PETCO, for ICNA to void coverage, it must show that the aquarium heater did not comply with United States mandatory or voluntary safety laws.[7]   Id., p. 2.   PETCO maintained that ICNA could not meet this burden for three reasons.  First, ICNA's use of

---

[6]    ICNA also denied coverage asserting that PETCO was not an additional insured under the policy.  Taylor Aff., Ex. 3.  For the purposes of its summary judgment motion, ICNA did not dispute that PETCO is an additional insured.  ICNA Memorandum of Law in Opposition to PETCO's Motion for Summary Judgment ("ICNA Mem. in Opp."), p. 8 ("The only coverage issue in dispute, for the purposes of these motions, is whether the aquarium heater was 'UL/CSA approved and/or complied with the mandatory and/or voluntary safety standards of importing countries.'") [Docket No. 70].

[7]    PETCO did not cite any specific laws governing the heater.

the word "voluntary" in the Products Warranty clause eviscerated any requirement that the aquarium heater meet any particular safety standard and allowed the insured the right to choose whether to follow a safety standard at all.  Id., p. 3.  Second, the United States has no mandatory safety standards for the importation of aquarium heaters; therefore, the aquarium heater cannot be described as having failed to meet a non-existent standard.  Id., p. 4.  Third, because United States Customs allowed the aquarium heater to be imported, it "complied with all United States laws."  Id.  In other words, U.S. Customs would not have allowed Meiko to import the aquarium heater into the United States if it was hazardous, even if it did not meet any particular safety standard.  In support of this argument, PETCO quoted from the United States Customs and Border Protection manual, which states:

> Any consumer product offered for importation will be refused admission and/or seized if the product fails to comply with an applicable safety standard or regulation, a specified labeling or certification requirement, or if it is determined to present a substantial product hazard.  The U.S. Consumer Product Safety Commission (CPSC), Washington, D.C. 20207 administers these requirements.

Id. (citing and quoting U.S. Customs and Border Protection 2006 Edition, Importing into the United States, p. 115).  PETCO found no safety regulations governing aquarium heaters.  Id., p. 5.  That fact, coupled with the fact that U.S. Customs allowed the aquarium heater into the country, was "undisputed proof" that the heater complied with all (unnamed) U.S. laws.  Id.  As such, the exclusion did not apply and the policy provided coverage.  Id.

At the hearing, PETCO additionally argued that the follows factors weighed in favor of its argument that the provision is an exclusion:  1) the language regarding

safety standards is found first on the Declarations page of the policy and is not called a condition precedent; 2) the language is next found on a page of the policy that lists exclusions; and 3) ICNA called the provision an "exclusion" in its denial of coverage letter.

Further, PETCO urged that the Court must give the term "voluntary" its normal meaning, and the ordinary meaning of the word is that compliance with safety standards is optional and failure to comply with any particular standard cannot result in loss of coverage.  According to PETCO, the phrase "voluntary standard" was an oxymoron because by its very nature, a "standard" is not voluntary.  Finally, PETCO argued that to the extent the Court could not decide if the Products Warranty provision was a condition precedent or an exclusion, then it should conclude that the provision is ambiguous and construe it against ICNA.

ICNA contested PETCO's assertion that the Products Warranty was an exclusion.  For starters, the provision is unambiguously called a "condition precedent." ICNA Reply Memorandum in Support of Motion for Summary Judgment, pp. 4-5 ("ICNA Reply Mem.").  The policy contained exclusions for asbestos, mold and fungi, pollution, professional liability, punitive damages, pure financial loss, silica, terrorism and USA/Canada domiciled operations.  Butler Aff., Ex. G, p. 2.  Thus, when ICNA wanted to call something an exclusion, it certainly knew how to do that.  ICNA Reply Mem., p. 4. Additionally, ICNA's failure to call the Products Warranty provision a "condition precedent" on the Declarations page does not work in PETCO's favor, because the "condition precedent" language is found in the endorsement section of the policy.  When a provision of a policy conflicts with an endorsement, the endorsement prevails.  Id., fn.

1 (citing <u>Steele</u>, 540 N.W.2d at 888 ("When provisions of a policy conflict with an endorsement or rider, the provisions of the endorsement govern.") (citation omitted)).

This Court concludes that the Products Warranty provision in the ICNA/Meiko policy is a condition precedent and not an exclusion, and consequently, it is PETCO's burden to establish coverage.

First, and most obviously, the Products Warranty provision is called a condition precedent in the endorsement section of the policy.   This Court cannot find any ambiguity in the policy language that states "[i]t is warranted and a <u>condition precedent to recovery hereunder</u>. . . .Failure to comply <u>with the condition of this warranty shall render this policy null and void</u>."   Butler Aff., Ex. G [Docket No. 66-1, p. 80] (emphasis added).   Consistent with the canons of construction of insurance policies, the Court cannot write out of the policy the words "warranty," "condition precedent" or "condition," or strain to make the words take on some meaning that they clearly do not have. <u>General Cas. Co. of Wis.</u>, 762 N.W. 2d at 575; <u>Gorr v. Consolidated Foods Corp.</u>, 91 N.W.2d at 782.   Adopting PETCO's argument on this point would require the Court to shut its eyes and ignore the plain language of the provision.

Second, although the Products Warranty provision is found among other provisions specifically called "exclusions," the placement of the Products Warranty clause within that part of the policy is not dispositive.   Placing the Products Warranty provision amid provisions that were exclusions and were not exclusions did not transform the condition precedent into an exclusion any more than an apple in a bin of oranges become an orange by association.   <u>Cf.</u> <u>Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.</u>, 73 F.3d 1178, 1205 (2d Cir. 1995) (exclusivity effect of policy language,

not its placement, controls allocation of the burden of proof), modified on other grounds, 85 F.3d 49 (2d Cir. 1996) with Jacobson v. Implement Dealers Mut. Ins. Co., 640 P.2d 908, 912 (Mont. 1982) (placement of an exclusion clause in an insurance contract was "lost in the myriad of verbiage" of the policy and would not have been noticed by an insured).

Third, it is evident from the Declarations page of the policy that the insurance that Meiko had obtained from ICNA was designed to provide coverage for products that were UL/CSA approved or complied with the safety standards (whether mandatory or voluntary) of the importing country. Butler Aff., Ex. G, p. 67. While the Declarations page did not use the phrase "condition precedent," the description of the "Products" covered by the policy makes it abundantly clear that only those products which met that requirement were covered by the policy. Id. Indeed, the policy explicitly states "Coverage is afforded under this policy in accordance with the specific Coverage Parts identified in Declarations as being part of this policy." Id., p. 69.

Finally, as a matter of public policy, the clause is appropriately construed as a condition precedent because only the insured could warrant that the aquarium heater complied with applicable safety standards of the importing countries, or even know the identity of the importing countries. To interpret the language as an exclusion would place ICNA in the untenable position of having to prove that the products at issue did not meet minimum safety standards of unidentified importing countries. This burden shift is clearly not what the parties contracted for, and "courts are not at liberty to use a process of judicial construction to graft into the plain language of a policy an intention to

afford coverage when no such intention appears from the language of the policy or otherwise." Gabrelcik v. National Indem. Co., 131 N.W.2d 534, 536 (Minn. 1964).[8]

Having determined that the Products Warranty provision is a condition precedent to coverage, the Court must now decide whether PETCO has met its burden in establishing that it fulfilled the condition.  For the reasons described below, the Court concluded that it has not.

### C.   PETCO Did Not Fulfill the Condition Precedent

PETCO does not dispute that the aquarium heater was not UL-approved. PETCO Mem., p. 14.  Nor does it dispute that there are no "mandatory" laws governing the importation of aquarium heaters into the United States.  PETCO Reply, pp. 3-4. Instead, PETCO argued that that it either met a "voluntary" safety standard by sending the heater to an independent testing facility, or that there is no such thing as a "voluntary safety standard" because the use of the term "voluntary" means that it was not required to meet any standard at all.  PETCO Reply, pp. 3-4.

In the Medtronic Action underlying this coverage dispute, Medtronic and PETCO addressed the issue of minimum safety standards.  Medtronic's expert Beth Anderson, P.E. opined that the aquarium heater "does not contain a UL mark.  The Meiko Pet Corporation file with UL does not contain any information that indicates that the Profile heater was a listed product.  There is no evidence to suggest that the Profile heater met

---

[8]      Because the language of the policy is clear and unambiguous, the Court does not (and should not) consider ICNA's representative's use of the word "exclusion" in his letter to PETCO's counsel.  Taylor Aff., Ex. 3.  The Court would only turn to such extrinsic evidence to the extent that it was required to interpret ambiguous language, which is not the case here. UnitedHealth Group, Inc. v. Columbia Cas. Co., Civ. No. 05-1289, 2010 WL 317521 at *7 (D. Minn. Jan. 19, 2010) ("Minnesota law is emphatic, however, that the Court cannot consider extrinsic evidence concerning the meaning of [a policy term] unless the Court first finds the [term] ambiguous.").

the minimum safety standards set by UL 1018 [Electric Aquarium Equipment]."   Butler

Aff., Ex. L, pp. 4-5 (Expert Statement of Opinions of Beth Anderson, P.E.) [Docket No.

66-2].

PETCO's expert Mark Svare, P.E. opined that Medtronic was at fault for misusing

the heater in violation of UL 1018.   Id., Ex. N, p. 3.   Further, Svare testified at his

deposition as follows:

> Q.   As an electrical engineer and as an expert offering
> opinions in this case, do you have any idea as to what the
> hazards might be of an aquarium heater?
>
> A.   Sure.   They're part of the instructions that are
> required as far as UL, so any of those would be in there, as
> well as any of the requirements to meet minimum safety
> standards.
>                                    ***
>
> Q.   And it's the minimum in terms of what needs to be
> done and it's a minimum in terms of the safety requirements
> for a product that covered within the umbrella of that
> particular standard?
>
> A.   Yes.
>
> Q   And [UL] 1018 deals with aquarium equipment?
>
> A.   Yes.

Butler Aff., Ex. O (Excerpt of Deposition of Mark Svare, P.E.), pp. 57, 82-83.

In short, in the Medtronic Action, PETCO's own expert opined that UL approval

represented the minimum safety standards for aquarium heaters.   Nevertheless, in the

DJ Action, PETCO has taken the position that either there are no voluntary or

mandatory safety standards regulating aquarium heaters or that "[t]he United States of

America's safety standards are set forth in its laws.   In other words, a product meets the

safety standards of the United States of America if it is lawful to import and sell the product." PETCO Mem., p. 14.

Relying on canons of construction, ICNA urged that the Court could not read the safety standard requirement out of the policy.  Rather, ICNA argued that the Court should interpret the policy in a way that gives meaning to the parties' intent—in this case, construing the Product Warranty provision to mean that ICNA cannot be required to provide coverage when a product was claimed to be defective because it did not meet the minimum safety standards of the importing country.  ICNA Mem., p. 11. According to ICNA, PETCO understood the significance of this provision because it required all of its products to be UL-approved and also sent all of its products to an independent testing laboratory to ensure that the products met the UL standards.  Id., (citing Butler Aff., Ex. J, pp. 17, 20) (excerpt of deposition of PETCO representative Robert Smith); Ex. K, pp. 31-32, 34) (excerpt of deposition of PETCO employee Kathryn Henkens).

In this regard, Smith testified:

> Q.    [H]ow does PETCO evaluate aquarium heaters when they are deciding which ones to purchase?
>
> A.    Sure.    The first thing, we have some standard requirements for any supplies that are presented to us. They have to be UL listed at the time that we review the product.
>
> ***
>
> Q.    When you purchase a product or when PETCO purchases a product, what verification does PETCO require to ensure that the product has been UL tested?
>
> A.    We ask the vendor to provide us proof that it has passed UL certification.    And then independent of that submission or declaration, we submit all products to a third-

party testing laboratory.  Bureau Veritas is the one we usually use.

Butler Aff., Ex. J, pp. 17, 20.

PETCO employee Kathryn Henkens testified:

Q.    And what's your understanding of what Underwriters Laboratory does?

A.    Underwriters Laboratory establishes criteria that are safety criteria.  That specific products. . .have to have passed specific tests that say, yes, they meet these criteria. So they establish the safety criteria.
* * *
Q.    What does PETCO require of its manufacturers or vendors in regards to the UL testing or certifications?

A.    We don't carry any product under our private brand that is not approved by UL testing standards.  So we require certification first from the manufacturer, that it meets UL test standards, and then to be safe we also send it to a testing lab like Bureau Veritas or other testing labs that check the product, do those same tests and confirm, yes, <u>it meets the standard</u>.

Id., Ex. K, pp. 30-32 (emphasis added).

ICNA asserted that all of the evidence in the Medtronic Action established that

UL approval provides the minimum safety standard that the aquarium heater must meet

and because the heater did not meet this standard, PETCO failed to carry its burden to

prove coverage.  ICNA Mem., pp. 12-13.[9]

_____

[9]    Both parties briefed the issue of whether the "and/or" language in the Product Warranty provision and as reflected on the Declarations page should be read in the disjunctive or conjunctive, and what effect that might have on the Court's decision regarding coverage.    ICNA Mem., p. 12; PETCO Mem., pp. 12-14; ICNA's Memorandum in Opposition to PETCO's Motion for Summary Judgment, pp. 10-11 [Docket No. 70]; PETCO's Memorandum in Opposition to ICNA's Motion for Summary Judgment, p. 5 [Docket No. 74].    At the argument on the cross-motions, the Court informed the parties that it would construe the language as disjunctive as that is the only reasonable interpretation of the language.  See Detroit Water Team Joint Venture v.

The Court is persuaded by ICNA's argument that UL approval represents a voluntary safety standard—and one that the aquarium heater unquestionably did not meet.  PETCO's focus and reliance on the UL standard in the Medtronic Action confirms that it accepted the UL standard as the minimum safety standard, which the aquarium heater did not satisfy.  PETCO's abandonment of its previous position that UL standards represent minimum safety standards, and belated attempt to avoid that position in the DJ litigation is rejected.

For example, PETCO's theory that by allowing a product into the country, U.S. Customs and Border Protection has somehow vouched for its safety is meritless.  Not only did PETCO provide no facts or law to support this proposition, but there is nothing in the public domain to suggest that the hundreds, if not thousands, of unsafe and dangerous products that have been imported into the United States were insulated from liability because they made it through Customs.  See, e.g. Consumer Products Safety Commission Press Statement on Corrosion in Homes and Connections to Chinese Drywall, http://cpsc.gov/info/drywall/nov2009statement ("We now can show a strong association between homes with the problem drywall and levels of hydrogen sulfide in those homes and corrosion of metals in those homes."); News from Consumer Products Safety Commission, "Reebok Recalls Bracelet Linked to Child's Lead Poisoning Death."

http://cpsc.gov/cpscpub/prerel/prhtml06/06119org.html ("Reebok has received a report

---

Agricultural Ins. Co., 371 F.3d 336 (6th Cir. 2003) (citing and quoting Local Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonswealth, 666 F.2d 627 (1st Cir. 1981) ("the words 'and/or' commonly mean 'the one or the other or both'"); Dynalectron Corp. v. Equitable Trust Co., 704 F.2d 737, 739 & n. 3 (4th Cir. 1983) (finding that "a virgule [-/-] normally is used to separate alternatives."); Fifty States Mgmt. Corp. v. Public Serv. Mut. Ins. Co., 324 N.Y.S.2d 345, 353 (N.Y. 2004) (construing "and/or" in an insurance policy as "either or both.").

of a death caused by lead poisoning of a 4-year-old child from Minneapolis, Minn. Charm was manufactured in China and imported by Reebok International, Ltd."); U.S. Food and Drug Administration: "Charges Filed in Contaminated Pet Food Scheme," http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm048139.htm. ("FDA's Office of Criminal Investigation announced that two Chinese nationals and the businesses they operate, along with a U.S. company and its president and chief executive officer, were indicted by a federal grand jury. . . for their roles in a scheme to import into the United States products they claimed were wheat gluten. The products were contaminated with melamine and used to make pet food.").

Similarly, PETCO's suggestion for the first time at the hearing[10] that it met a "voluntary" safety standard by having its products evaluated by the Bureau Veritas,[11] finds no support in the record. PETCO presented no evidence that the aquarium heater was certified by Bureau Veritas, and the evidence is just the opposite. While PETCO employees Smith and Henkens both testified that generally PETCO sent products to Bureau Veritas to confirm that the products met UL standards, neither testified that the

---

[10]    At the hearing, ICNA's counsel aptly described this argument as PETCO's "Hail Mary." "A Hail Mary pass in American football is a long forward pass made with desperation at the end of a game, with only a small chance of success." United States v. George, --F.3d--, 2012 WL 1292532 at *1 (1st Cir. Apr. 17, 2012). In any event, PETCO did not brief this issue, although it had ample opportunity to do in support of its own motion and in response to ICNA's motion. An argument raised for the first time at the motion hearing, depriving ICNA of the opportunity to properly respond, is not properly before the Court. Mohammed v. Frazier, Civ. No. 07-3037 (RHK/JSM), 2008 WL 360778 at *4, fn. 3 (D. Minn. Feb. 8, 2008) (rejecting defendants' argument raised for the first time at a hearing as not properly before the Court, as the opposing party had no opportunity to address such a claim).

[11]    Bureau Veritas describes itself as an organization "accredited to verify and give official acknowledgment (with a certificate) that a system, product, person or asset complies with a specified requirement for which certification is required." http://bureauveritas.com.

heater at issue went through that process.  Butler Aff. Ex. J, p. 64 (excerpt of deposition

of Smith, who indicated that he had Bureau Veritas reports for a different heater, not the

heater at issue); Ex. K (excerpt of deposition of Henkens, who indicated that PETCO

generally requires independent verification when a manufacturer states that its product

meets UL standards, but did not testify that PETCO sent the aquarium heater at issue to

Bureau Veritas); Ex. M, p. 52 (excerpt of deposition of Beth Anderson, P.E., Medtronic's

expert who testified that she had Bureau Veritas reports on a different heater, but not

the heater at issue); Ex. N (expert report of Mark Svare, P.E. by PETCO's expert, which

does not reference Bureau Veritas or other independent testing of PETCO's products);

Ex. O (excerpt of Svare's deposition in which Svare testified that he reviewed Bureau

Veritas documents for an "aquatic garden" heater, not the heater at issue.).   General

statements that PETCO's practice was to send its products to Bureau Veritas cannot

bind ICNA to provide coverage for damages caused by the heater at issue.

The Court also rejects PETCO's argument that the use of the word "voluntary" in

the Products Warranty clause and on the Declarations page "eviscerated" any

requirement that the aquarium heater meet any particular safety standard, (PETCO

Reply, p. 3), or that the phrase "voluntary standard" is an oxymoron.   Adopting this

theory requires the Court to read out the requirement that the insured's products meet

<u>some</u> safety standard, whether it is UL/CSA approved or a mandatory or voluntary

safety standard.    The Court cannot do that without violating basic canons of

construction of insurance policies, which it will not do.  <u>See</u> <u>In re SRC Holding Corp.</u>,

545 F.3d at 666 (When interpreting an insurance contract, the court must consider the

policy as a whole, giving effect to all of its provisions); <u>Haarstad v. Graff</u>, 517 N.W.2d

582, 584 (Minn. 1994) (same); <u>Bobich v. Oja</u>, 104 N.W.2d 19, 24 (Minn. 1960) (all terms of an insurance policy must be given effect if possible); <u>Kaysen v. Federal Ins. Co.</u>, 268 N.W.2d 920, 924 (Minn. 1978) (the Court cannot rewrite an insurance policy to benefit a party claiming coverage).   The Court agrees that ICNA's explanation of the term "voluntary safety standard" is both sensible and in line with the obvious intent of the policy language—a "voluntary safety standard" is one for which there is no civil or criminal penalty for failing to comply.

In summary, the ICNA/Meiko policy required PETCO to demonstrate that the aquarium heater met some safety standard, and PETCO was unable to show that the heater met <u>any</u> safety standard.   On these undisputed facts, the Court concludes as a matter of law that the ICNA/Meiko policy does not afford coverage to PETCO (or Medtronic, which stands in PETCO's shoes) for the damages caused by the aquarium heater and recommends granting ICNA's Motion for Summary Judgment and denying PETCO's Motion for Summary Judgment.[12]

## VIII.   RECOMMENDATION

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.     ICNA's Motion for Summary Judgment [Docket No. 63] be **GRANTED**; and

2.     PETCO's Motion for Summary Judgment [Docket No. 58] be **DENIED**.

---

[12]     Having determined there is no coverage, all issues regarding the validity and enforcement of the Medtronic/PETCO <u>Miller-Shugart</u> Agreement are moot.

Dated: June 4, 2012                    *Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United State Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 18, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.